UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

```
DARRELL GRIGSBY,              )
                             )
            Plaintiff        )
                             )
        v.                   )  Case No. 2:04 cv 231
                             )
JO ANNE B. BARNHART,         )
Commissioner of Social Security )
                             )
            Defendant        )
```

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the plaintiff, Darrell Grigsby, on October 14, 2004.  For the reasons set forth below, the motion is **GRANTED**.

Background

The plaintiff, Darrell Grigsby, initially applied for SSI disability and Disability Insurance Benefits on December 5, 2000, alleging disability commencing that day due to chronic schizo-phrenia.[1]  (Tr. 148-50, 307-09) The Social Security Administra-tion ("SSA") denied his application on March 21, 2001, and again upon reconsideration on May 15, 2001.  (Tr. 38-44) Grigsby requested a hearing before an administrative law judge ("ALJ") on May 18, 2001, and a hearing was held before ALJ William J. Wilkin on February 7, 2002.  (Tr. 32, 45) Subsequent to the hearing in which Grigsby and Vocational Expert ("VE") Michelle Peters testified, the ALJ denied Grigsby's application by written

---

[1] Grigsby had been receiving social security benefits from approximately 1979 to 2000.  (Tr. 17) However, Grigsby is not appealing a cessation deci-sion, but rather the ALJ's determination that he was not disabled on a new application for benefits.

decision dated April 9, 2002.  (Tr. 29-37) The Appeals Council
initially denied Grigsby's request for review but subsequently
remanded the case to ALJ Wilkin to correct multiple errors on
October 18, 2002.  (Tr. 99-102) Consequently, ALJ Wilkin con-
ducted another hearing on May 13, 2003 and issued a second
decision denying benefits on September 5, 2003. (Tr. 16-24,319)
The Appeals Council finally rejected Grigsby's application on
April 9, 2004.  (Tr. 5) Grigsby filed his complaint in this court
on June 21, 2004.

Grigsby was born in Gary, Indiana on October 3, 1957, and is
now 47 years old.  (Tr. 332) He was separated at the time of the
ALJ hearing and has a 28 year old son.  (Tr. 333) The highest
level of education he completed was the 10th grade.  (Tr. 179)

Grigsby performed refuge work on a full-time basis for the
City of Gary from 1977 to 1982, and then he did not work again
until he took a part-time janitorial position from 1996 to
February 3, 2003.  (Tr. 199, 356-57) As a janitor, Grigsby walked
approximately four hours and stood one hour each day, frequently
lifted 10 pounds, sometimes drove the cleaning truck, and super-
vised others.  (Tr. 174, 335, 339-40) Around 1999, he said that
he was working an average of 20 hours a week, representing four
hours a day, five days a week.  (Tr. 336-37) By the time he
stopped working in 2003, he stated that he was working between
12-15 hours a week, or 17 at most, over a three day period.  (Tr.
336-38) He characterized these reductions as the result of his
employer losing cleaning contracts.  (Tr. 336-38) He further

stated that he told his employer he could not work full-time because he would get too tired, and because he heard voices and saw pictures.  (Tr. 341-43) For the relevant time period, December 5, 2000 through August 31, 2002, Grigsby had average monthly earnings of $663 in 2001 and $624 in 2002.  (Tr. 17-18) He was fired from his janitorial position because he damaged the company truck.  (Tr. 212, 365)

Around April 1999, Grigsby felt like he "needed help" and went to Edgewater Systems for Balanced Living where he previously had received outpatient therapy for schizophrenia between 1984 and 1986.  (Tr. 237, 371) In his admissions assessment, Grigsby stated that "I am here to keep my SS benefits coming," a statement later denied by Grigsby.  (Tr. 236, 372) Admissions counselor Patrice Purpin stated that Grigsby was experiencing audio-visual hallucinations, and she noted that his judgment and insight were good, that he was oriented, that he displayed average intellect, and that he was friendly, cooperative, and responsive.  (Tr. 239) Purpin provisionally diagnosed Grigsby with schizophrenia-disorganized type, alcohol abuse, and problems with social environment, a diagnosis in which primary therapist Janice Peterson concurred on November 23, 1999.  (Tr. 235, 239) However, after multiple failed attempts to contact Grigsby following his initial appointment, Edgewater closed his case in November 1999.  (Tr. 234)

In the disability report Grigsby filed with his application for benefits on December 5, 2000, Grigsby stated that seeing

3

pictures and hearing voices prevented him from concentrating on any job and that he could not get out of bed sometimes.  (Tr. 173) Disability interviewer E. Alcaraz did not observe that Grigsby had any physical or communication difficulties and noted that Grigsby was well-behaved, wore dark sunglasses, sometimes was soft-spoken, and appeared a little tense during the inter-view.  (Tr. 170)

On February 8, 2001, psychologist Jeffrey Karr examined Grigsby for the Disability Determination Bureau ("DDB").  (Tr. 263) In this evaluation, Grigsby described his off-work activi-ties as watching television, listening to the radio, and spending time with his girlfriend.  He also stated that he could drive, cook, and do other chores without difficulty, that he did not have an alcohol or drug problem, and that he never had been on psychogropic medications.  (Tr. 263-64) He stated that he had been psychiatrically hospitalized on other occasions, but he could not identify precipitants to those hospitalizations or describe symptoms other than audio-visual hallucinations.  (Tr. 264)  Karr also interviewed Grigsby's brother who stated that Grigsby drank on a daily basis by himself and had been on medica-tion, though he was not taking anything at the time.  (Tr. 264) In his mental status evaluation, Karr noted that Grigsby wore soiled clothing, did not appear to be a reliable informant, had "limited insight and questionable judgment," and required "fre-quent repeated instructions," although he did not appear to have problems with distractability.  (Tr. 265)  Karr ultimately

diagnosed Grigsby with alcohol abuse and a psychotic disorder not
otherwise specified by history and stated that during the 50
minute exam, "there was no indication of gross psychopathology,
overt substance usage, or other behavioral abnormalities."  (Tr.
266)

On March 14, 2001, a Claims Adjudicator at the DDB spoke
with Grigsby's work supervisor, Robert McCasland.  (Tr. 141) In a
one paragraph statement, McCasland said that Grigsby was working
approximately 24 hours a week and was the lead man on his crew.
(Tr. 141) He said that Grigsby was able to "understand and carry
out very short and simple instructions and [was] able to work
independently if the supervisor [had] left the immediate area,"
could accept instructions and criticism, and did not require any
special consideration during his employment, but that he had
trouble working at a consistent pace and had occasional trouble
getting along with co-workers.  (Tr. 141)

On March 15, 2001, Dr. J. Gange completed a psychiatric
review technique ("PRT") for the DDB based on the evidence on
record.  (Tr. 267)  Gange concluded that Grigsby had non-severe
"coexisting nonmental impairment(s) that [required] referral to
another medical specialty."  (Tr. 267)  Gange concluded that
Grigsby had alcohol addiction and some psychotic features that
did not precisely fit a diagnosis of schizophrenia, which caused
mild difficulties in activities of daily living, maintaining
social functioning, and maintaining concentration, but did not
cause episodes of decompensation.  (Tr. 269, 275, 277)

In his request for an ALJ hearing on May 17, 2001, Grigsby said that he was making less than $700/month, and that he was going back to Edgewater for treatment.  (Tr. 187)

On September 13, 2001, Dr. Pamela Tran from Edgewater Systems completed a psychiatric impairment questionnaire which indicated that she had been seeing Grigsby every two or three weeks since May 17, 2001.  She diagnosed Grigsby with chronic schizophrenia, with symptoms of sleep disturbance, hallucinations, anhedonia, paranoia or inappropriate suspiciousness, social withdrawal or isolation, persistent irrational fears, and generalized persistent anxiety.  (Tr. 289) She said that Grigsby had poor grooming, a low stress tolerance, opined that Grigsby could not work every day, and stated that if Grigsby was required to work more than 15 hours a week, he would experience more hallucinations.  (Tr. 289) She also noted that Grigsby had poor to fair eye contact, a restricted affect, presented a nervous and dysthemic mood, mumbled at times, appeared preoccupied, and stated that his psychiatric condition caused him to experience pain in his abdomen and on one his side of his body.  (Tr. 290) She concluded that he had marked restrictions of daily living with insufficient evidence, marked difficulties maintaining social functioning, often experienced deficiencies in concentration, persistence, or pace, and had repeated episodes of deterioration or decompensation in a work-like setting.  (Tr. 291) She also stated that he was taking 1 mg. of Resperdal a day which caused drowsiness. (Tr. 290) In a subsequent questionnaire

6

dated November 30, 2001, Tran clarified that Grigsby had no problems with alcoholism. (Tr. 295)

In a letter dated January 24, 2002, Tran reiterated that Grigsby has suffered from chronic schizophrenia since age 22, had been psychiatrically hospitalized four or five times between 1981 and 1985, had insomnia, paranoid delusions, and somatic delusions, and was seclusive and unable to participate in group treatment at that date. (Tr. 306) She described his prognosis as guarded to poor and his functioning level as marginal, and she stated that he was not expected to be able to go back to work full-time in the future. (Tr. 306)

On October 14, 2002, McCasland completed a job evaluation for Grigsby in which he stated that Grigsby was working 17.75 hours per week, showed up on time, and had a "good" ability to maintain a work routine, concentrate on assigned work, and understand and carry out very short, simple instructions. (Tr. 222-23) He said that Grigsby's health did not require frequent breaks or rest periods, that his ability to complete assigned work was "good most of the time," and that Grigsby had an "ok" ability to accept instructions and criticism and work with others, although he sometimes had a problem with fellow employees over "who is the boss." (Tr. 223) McCasland also said that Grigsby had a poor ability to ask for help and needed supervision insofar as keeping the truck "full of gas and in good repair" but that he did not pose safety risks. (Tr. 224)

Following the ALJ's initial denial of benefits, the Appeals Council remanded Grigsby's case to the ALJ on October 18, 2002 in part because of the inconsistencies within the record between Dr. Tran's reports and McCasland's commentary.  According to the Appeals Council:

> The Administrative Law Judge stated that he balanced the reports of the claimant's employer and of the consultative psychologist with that of the treating psychiatrist to conclude the claimant was capable of substantial gainful activity.  However, the record does not contain any indication of an attempt to recontact Dr. Tran to clarify the descrepancies [sic] between her assessments and those of the claimant's employer and consultative psychologist.

> (Tr. 101)

The Appeals Council further stated, "As appropriate, the Administrative Law Judge may request the treating source to provide additional evidence and/or further clarification of the [treating source's] opinion."  (Tr. 101)

On November 26, 2002, Castezas Mattsesen, an individual of unknown title and education at Edgewater, completed a new psychiatric impairment questionnaire diagnosing schizophrenia and noting that Grigsby attended therapy sessions twice a week and saw the doctor every four weeks.  (Tr. 297) Mattsesen generally concurred with Dr. Tran insofar as Grigsby's symptoms and functional limitations and further stated that Grigsby had a "poor overall social and occupational" functioning, poor personal hygiene, slow thought processes, and hallucinations.  (Tr. 197-99) Mattsesen stated that Grigsby would have difficulty working a

8

regular job on a substantial basis because he had a "poor ability to tolerate" and poor social skills.  (Tr. 298)

During the ALJ hearing on May 13, 2003, Grigsby described his problem as hearing voices and seeing pictures.  (Tr. 343) These hallucinations began to occur while he was working full-time for the City of Gary, ultimately leading to his hospitalization for several months in the early 1980's.  (Tr. 361-62) After he left his job with the City, he did not look for work again until a friend of his helped him get his janitorial job in 1996. (Tr. 363-64) He testified that at that time, if he worked more than part-time he began to hear loud voices and that he felt more relief when he was working three days a week.  (Tr. 341-42, 366) However, if he took his medicine for the voices, it would put him to sleep.  (Tr. 341-42, 351) Consequently, he sometimes either would take naps at work or not take medication at all for the day.  (Tr. 344) He also stated that he had limitations lifting and carrying, because his legs would go out and he would fall, but that he could carry a 10 pound object, such as a chair.  (Tr. 349-50) He said that he had heard about the "$700 rule," which states that a claimant who has earned under $700 a month generally will be considered not to have engaged in substantially gainful activity, but he also testified somewhat incomprehensibly about "trying to keep up with" this rule and people telling him "when the time has changed" with regard to it.  (Tr. 358)

9

With respect to his non-work activities, Grigsby testified that he would try to get six hours of sleep a night, cook for himself, do laundry, shop for groceries, watch television, and drive to his father's house for a visit on a routine basis. (Tr. 345-46) He also socialized with friends. (Tr. 353) He did not drink alcohol, but he did smoke a half pack of cigarettes a day. (Tr. 347)

Grigsby's uncle, Walter Grigsby, then testified that he saw Grigsby at least two or three times a week. (Tr. 379) He said that Grigsby was a good driver and was pretty good with paying his bills. (Tr. 380, 392) However, he stated that Grigsby would be talking one minute and then appear as though something else was attracting his attention the next and that he would sometimes need to remind Grigsby to take his medication or to bathe. (Tr. 383, 385) He stated that Grigsby was fired from his job with the City of Gary because he would eat his co-worker's food. (Tr. 381) He further testified that if Grigsby worked beyond his comfort zone, he would begin to get depressed and nervous, but he was scared to tell anyone until he "broke down." (Tr. 388) Walter stated that he had seen Grigsby break down and that he had found him living in an abandoned building after he lost his job with the City of Gary. (Tr. 388)

Following Grigsby and his uncle, VE Michelle Peters testi-fied that Grigsby's previous janitorial job was considered to be unskilled in nature and light in physical demand. (Tr. 394) In contrast, the City of Gary job was unskilled in nature and medium

in physical demand.  (Tr. 394) Next, ALJ Wilkin posed four
hypotheticals to Peters.  (Tr. 394) In response to the first
hypothetical, Peters testified that if Grigsby was limited to
medium work function with low degrees of concentration and could
not work in direct contact with the public, he could perform
6,000 janitorial jobs, 1,000 assembly positions, and 1,000 hand
packaging positions.  (Tr. 394-95) In response to the second
hypothetical for light work with the same restrictions, Peters
testified that Grigsby could perform his previous janitorial job.
(Tr. 395) In a third hypothetical for sedentary work with the
same restrictions, Peters testified that Grigsby could perform
500 hand packaging and 800 assembly positions.  (Tr. 395-96)
Finally, in response to the fourth hypothetical for medium,
light, or sedentary work, Peters stated that if Grigsby could not
sustain eight hours of work for any cause, then full-time work
would be precluded.  (Tr. 396)

On cross-examination, Peters testified that if Grigsby had
inappropriate behavior causing a disruption, or if he was absent
two or more days a month, no jobs would be available.  (Tr. 400-
03) She then clarified that all the answers she gave to the
hypotheticals given by the ALJ were given in the context of an
individual working eight hours a day, five days a week.  (Tr.
404)

In his decision denying disability benefits, ALJ Wilkin
noted that the "earnings threshold for a presumption of substan-
tial gainful activity was $740 per month in the calendar year

11

2001 and $780 per month in the calendar year 2002."  (Tr. 18)
Although Grigsby earned $663 in 2001 and $624 in 2002, the ALJ
stated that "there [were] no indications whatsoever that the
claimant could not have worked at a substantial gainful activity
level had he so desired."  (Tr. 18) In support of this conclu-
sion, the ALJ detailed McCasland's March 14, 2001 report which
the ALJ stated contained no indication that Grigsby was working
to his maximum capacity, as well as McCasland's October 14, 2001
job evaluation.  (Tr. 18-19) He also noted that Grigsby earned
$725 per month in 1997, self-selected work that was part-time,
and was fired because of an accident involving a vehicle, rather
than an inability to do his job.  (Tr. 18-19) Therefore, the ALJ
stated that Grigsby was not disabled for the relevant period
because he could have performed more work than he actually had,
in the absence of "any contrary evidence."  (Tr. 19)

     Although ALJ Wilkin found that Grigsby was able to perform
substantial gainful activity at Step One, he continued through
the disability analysis, finding that Grigsby was impaired by
reason of "severe" schizophrenia which did not meet or equal the
criteria for any Listing during the relevant period.  (Tr. 19) In
reaching this conclusion at Step Three, the ALJ reviewed the
findings of  Karr's 50 minute examination of Grigsby and noted
that on two occasions, McCasland stated that Grigsby "could
function reasonably well in his job," except for his reported
tendency to push work off onto others and poor ability to ask for
help.  (Tr. 20) He also noted Tran's responses to the September

13, 2001 Psychiatric Impairment Questionnaire, in which she diagnosed Grigsby with chronic schizophrenia, and stated that he had "low stress tolerance, poor grooming, restricted affect, nervousness, dysthymic mood, and a variety of other symptoms." (Tr. 20) However, the ALJ noted that  Tran also reported that Grigsby was working 15 hours a week, although she said his symptoms would increase with longer hours.  (Tr. 20) Based on these reports, the ALJ found that Grigsby did not meet a Listing at Step Three because he was "only mildly restricted in activities of daily living, and moderately restricted in social functioning as well as in concentration, persistence, and pace," with no evidence of episodes of decompensation, between December 6, 2000 and August 31, 2002.

In determining Grigsby's RFC at Step Four, ALJ Wilkin rejected Gange's March 2001 PRT, concluding instead that Grigsby's mental impairments were severe based on the Karr and Tran reports.  (Tr. 21) Nevertheless, the ALJ gave only moderate weight to Tran's opinion that Grigsby could not work more than 15 hours per week and that he had "marked restrictions in activities of daily living and social functioning, and often [experienced] deficiencies in concentration, persistence or pace."  (Tr. 21) In declining to adopt fully Tran's opinion, ALJ Wilkin explained that McCasland's two reports showed that Grigsby had good overall function on his job, and that despite Tran's September 2001 statement that Grigsby could not work more than 15 hours per week, he actually was working 24 hours per week in March 2001 and

13

18-20 hours per week in 2002 and 2003.  (Tr. 21-22) Therefore, ALJ Wilkin concluded that Grigsby could return to his past relevant work as a janitor.  (Tr. 22)

Despite finding Grigsby not disabled on Steps One and Four, the ALJ proceeded to find, in the alternative, that Grigsby could perform other work in the economy at Step Five.  (Tr. 22) In so doing, the ALJ found that Grigsby could perform 6,000 janitorial, 1,000 assembly, and 1,000 handpacking jobs, consistent with the first hypothetical the ALJ posed to VE Peters for medium work function with low degrees of concentration and no direct contact with the public.  (Tr. 22)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Secu-rity Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. ß405(g)  ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive.");  *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003);  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  Sub-stantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct 1420, 1427, 28 L.Ed.2d 852 (1972) (*quoting* **Consolidated Edison Company v. NLRB,** 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)).  *See also* **Sims v. Barnhart**, 309 F.3d 424, 428 (7th Cir. 2002);

14

*Green v. Shalala,* 51 F.3d 96, 101 (7th Cir. 1995).  An ALJís decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Golembiewski*, 322 F.3d at 915; *Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir. 2000).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex. rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

     Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.   The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. ß423(d)(1)(A). The Social Secu- rity regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.   20 C.F.R. ßß404.1520, 416.920.  The ALJ first considers whether the claimant is pres- ently employed or "engaged in substantial gainful activity." 20 C.F.R. ßß404.1520(b), 416.920(b).   If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20

15

C.F.R. §§404.1520(c), 416.920(c).  Third, the ALJ determines
whether that severe impairment meets any of the impairments
listed in the regulations.  20 C.F.R. § 401, pt. 404, subpt. P,
app. 1.  If it does, then the impairment is acknowledged by the
Commissioner to be conclusively disabling.  However, if the
impairment does not so limit the claimant's remaining capabili-
ties, the ALJ reviews the claimant's "residual functional capac-
ity" and the physical and mental demands of his past work.  If,
at this fourth step, the claimant can perform his past relevant
work, he will be found not disabled. 20 C.F.R. §§ 404.1520(e),
416.920(e).  However, if the claimant shows that his impairment
is so severe that he is unable to engage in his past relevant
work, then the burden of proof shifts to the Commissioner to
establish that the claimant, in light of his age, education, job
experience and functional capacity to work, is capable of per-
forming other work and that such work exists in the national
economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §§404.1520(f),
416.920(f).

Grigsby's principle argument in support of remand is that
the ALJ improperly rejected the opinion of Tran and failed to
recontact Tran to clarify the ALJ's perceived inconsistency
between her reports and other evidence on record.  This error,
Grigsby contends, rendered the ALJ's decision deficient on Steps
One, Four, and Five.  This court agrees.

When a claimant is employed, the Social Security Regulations
direct the ALJ to evaluate the claimant's earnings to determine

16

whether his work constitutes substantial gainful activity ("SGA") at Step One. *See* 20 C.F.R. ß404.1574(1). According to the Regulations, a claimant must have earned $740 a month in 2001 and $780 a month in 2002 in order to be found to engage in SGA. *See* 20 C.F.R. ß404.1574(b)(6)(i). However, "the fact that the claimant's earnings are not substantial will not necessarily show that the claimant is not able to do [SGA], it may show that the claimant is able to do more work than the claimant actually did." 20 C.F.R. ß404.1574(a)(1). Rather, "[e]ven if the work the claimant has done is not [SGA], it may show that the claimant is able to do more work that the claimant actually did." 20 C.F.R. ß404.1571. *See also **Ashworth v. Sullivan***, No. 90-00233, 1991 WL 278961, at *7 (6th Cir. Dec. 30, 1991). The ALJ must consider all of the medical and vocational evidence in the file to decide whether the claimant has the ability to engage in SGA. 20 C.F.R. ß404.1571.

In the Step One evaluation, as in determining a claimant's RFC at Step Four and resulting ability to perform other work at Step Five, a treating doctor's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. ß404.1527(d)(2). *See also* SSR 96-2p, at *1; ***Gudgell v. Barnhart***, 345 F.3d 467, 470 (7th Cir. 2003); ***Books v. Chater***, 91 F.3d 972, 979 (7th Cir. 1996) (*quoting **Stephens v.***

*Heckler*, 766 F.2d 284 (7th Cir. 1985)) (holding that with respect to conflicting opinions of a treating and a consulting physician, "the ALJ must take into account the treating physician's ability to observe the claimant over a longer period."). For example, the ALJ may reject the opinion of a treating doctor if it is "inconsistent with other medical evidence in the record, such as opinions from consulting physicians." *Wilson v. Barnhart*, 130 Fed. Appx. 42, 46 (7th Cir. 2005).

As a general rule, the ALJ has discretion to decide whether to recontact a treating physician unless the existing evidence is "inadequate to determine whether the claimant is disabled." *Walker v. Barnhart*, 127 Fed. Appx. 207, 212 (7th Cir. 2005) (*quoting* *Skarbek v. Barnhart*, 105 Fed. Appx. 836, 839 (7th Cir. 2004)). *See also* 20 C.F.R. ß404.1512(e). However, if the ALJ bases his rejection of a treating physician's opinion on the grounds that it lacks support, the ALJ must "solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). Similarly, the ALJ must recontact the treating physician for clarification if she provides an opinion on "issues reserved to the Commissioner and the bases for such opinions are not clear." SSR 96-5p, at *2. Additional contact is necessary when the physician gives an opinion on "an individual's physical or mental abilities to perform work-related activities on a sustained basis." SSR 96-5p, at *4.

Although the medical evidence in this case, though slim, is not contradictory within itself, ALJ Wilkin ignored it entirely at Step One.  He also improperly discounted the treating physicians' statements in light of two scant statements by Grigsby's employer when considering Steps Four and Five.  Following the ALJ's rejection of Gange's March 15, 2001 PRT, the only pertinent medical evidence remaining on record was Karr's February 8, 2001 evaluation, two questionnaires dated September 13, 2001 and November 30, 2001 from Tran, a January 24, 2002 letter from Tran, and a November 26, 2002 questionnaire from Mattsesen who, although the record does not state was a physician, treated Grigsby on a regular basis.  (Tr. 297) Tran and Mattsesen were entirely consistent in their reports.  (Tr. 289-95, 297-99, 306) Both sources noted that Grigsby experienced sleep disturbance, delusions or hallucinations, anhedonia or pervasive loss of interest, paranoia or inappropriate suspiciousness, and social withdrawal or isolation, among other symptoms.  (Tr. 289, 297) Both stated that he had poor grooming, poor ability to function in a social or occupational capacity, and poor ability to manage stress. (Tr. 289-90, 297-98)  Tran stated that if Grigsby increased his work beyond 15 hours a week, he would experience increased symptoms, and Mattsesen opined that Grigsby would have difficulty working a regular job on a substantial basis.  (Tr. 289, 298) These reports are consistent with the testimony of Grigsby, who stated that he felt more relief working part time and experienced an increase in auditory hallucinations when he worked more, and

with the testimony of Grigsby's uncle who stated that Grigsby got depressed and nervous and would experience a breakdown if he worked beyond his comfort zone.  (Tr. 341-42, 366, 388) Finally, all of this evidence is consistent with the report of Karr, who observed that Grigsby wore soiled clothing, was not a reliable informant, presented "limited insight and questionable judgment," required "frequent repeated instructions," made limited eye contact, and could not handle his own funds.  (Tr. 265-66)

Despite all of these reports, the Regulations' directive to consider both vocational <u>and</u> medical evidence at Step One, and the undisputed fact that Grigsby collected earnings below the threshold for SGA from 2000-2002, ALJ Wilkin concluded that solely on the basis of statements made by Grigsby's employer and "absent any contrary evidence" that Grigsby could perform SGA. In addition to the logical and legal errors presented by such reasoning, the ALJ's conclusion is not supported by the voca-tional evidence on which he relied.

As a practical matter, a claimant's ability to work at a part-time basis does not automatically dictate an ability to work at a full-time or otherwise substantially gainful level, particu-larly when the accepted medical evidence points to an increase in disability-related symptoms with increased work.  Beyond earnings reports, the relevant vocational evidence on record consists of a one paragraph statement taken by telephone from McCasland, Grigsby's supervisor, on March 14, 2001 and a job evaluation McCasland completed on October 14, 2002, almost entirely in one-

20

syllable answers.  (Tr. 141, 222-23) The 2001 statement noted
that Grigsby was working 24 hours a week as lead man, could carry
out simple instructions, and could work independently if a
supervisor left the room, but that he had trouble working consis-
tently or cooperating with co-workers.  (Tr. 141) The 2002
evaluation, which stated that Grigsby worked 17.75 hours, pro-
vided largely the same information regarding Grigsby's work
abilities. (Tr. 222-23) McCasland did not express an opinion in
either of these records regarding whether Grigsby was working to
maximum capacity or could work more, and he did not express any
opinion on Grigsby's behavioral response to working additional
hours.  Given McCasland's silence and the medical evidence on
record, ALJ Wilkin's extrapolation of McCasland's statements to
conclude that Grigsby could work at a substantially gainful level
is totally unsupported by the evidence.

Finally, under the circumstances of this case, the ALJ had a
duty to recontact at least Tran before declining to give her
opinion controlling weight at Step Four.  Both Tran and Mattsesen
opined that Grigsby could not work on a substantial basis, which
is an issue reserved for the Commissioner.  *See* SSR 96-5p, at *2.
As such, the ALJ had an obligation to recontact one or both of
these sources before discounting their opinions.  *See* SSR 96-5p,
at *6.  Moreover, the primary basis on which ALJ Wilkin rejected
Tran's opinion was that Grigsby was working more hours than Tran
recommended for the management of his schizophrenia-related
symptoms.  (Tr. 21-22) Citing the same inconsistency, the Appeals

21

Council remanded this case in part so that the ALJ could recon-tact Tran to clarify her statements.  (Tr. 101) ALJ Wilkin repeated this error in failing to recontact Tran following the Appeals Council's remand, and then relying upon the inconsistency to deny benefits a second time.

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the plaintiff, Darrell Grigsby, on October 14, 2004, is **GRANTED**.

ENTERED this 6th day of September, 2005

s/ ANDREW P. RODOVICH
United States Magistrate Judge

22